THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| JANE KOLER/LAND USE & PROPERTY LAW, PLLC, a Washington Professional Limited Liability Company, ANNE BREMNER/FREY BUCK, P.S., a Washington Professional Service Corporation, and DANIEL GLENN/GLENN & ASSOCIATES, P.S., a Washington Professional Service Corporation, | No. 82119-9-I (consolidated with No. 82161-0-I) DIVISION ONE PUBLISHED OPINION |
| Appellants, | |
| v. | |
| CITY OF BLACK DIAMOND, a Washington municipal corporation, and CAROL BENSON, a married woman, | |
| Respondents. | |

ANDRUS, A.C.J. — Attorneys Jane Koler, Daniel Glenn and Anne Bremner, and their affiliated law firms, appeal the dismissal of their contract action against the City of Black Diamond (the City) and its mayor, Carol Benson. The attorneys brought suit to collect unpaid legal fees incurred under contracts executed by former city councilmembers. The trial court held the mayor had the exclusive authority to appoint a city attorney under RCW 35A.12.090 and the councilmembers lacked the authority to retain additional legal services at public

expense under State ex rel. Steilacoom v. Volkmer, 73 Wn. App. 89, 867 P.2d 678 (1994). It concluded that the legal services agreements with all three law firms were invalid.

We hold that the mayor did not have the authority to appoint a city attorney under RCW 35A.12.090 because the city council had not passed an ordinance making the position an "appointive officer" as required by RCW 35A.12.020. The City obtained legal services by "reasonable contractual arrangement" authorized by RCW 35A.12.020, and the legislature has placed the power to enter into such contracts, under RCW 35A.11.010, with the city council, not the mayor. The city council had the authority to execute legal services contracts with these law firms and the mayor lacked veto power to reject the council's decision. We therefore reverse the trial court's order granting summary judgment in favor of the City.

FACTUAL BACKGROUND

In March 2014, the City of Black Diamond contracted for municipal legal services with Carol Morris and her law firm. The city council passed Resolution No. 14-933, recognizing that the mayor had "appointed" Morris and her law firm "to the position of City Attorney" and confirmed the mayor's "appointment." By Resolution No. 14-934, the council authorized the mayor to enter into a professional services agreement with Morris. The then mayor, Dave Gordon, executed the contract with Morris the following day.

The scope of work attached to the contract identified Morris as "the City Attorney." It tasked her with "performing routine legal work for the City," including preparing draft ordinances, agreements, resolutions, and other legal documents

requested by the City, and providing legal advice to the mayor and councilmembers.

In April 2016, a majority of the five-member city council—former councilmembers Pat Pepper, Erika Morgan, and Brian Weber—expressed dissatisfaction with Morris's legal advice and passed a resolution terminating her contract. Mayor Carol Benson stamped this resolution "denied" and noted that "[t]he Council does not have the authority to terminate [a] contract [for] legal services." According to the mayor, Morris chose to resign shortly thereafter.

In May 2016, the city councilmembers sought a legal opinion regarding the competing claims of authority to contract for city attorney services from the law firm of Talmadge, Fitzpatrick and Tribe. Attorneys Talmadge and Fitzpatrick opined that under chapter 35A.12 RCW, the city could retain legal counsel through one of two means—by "appointment" of a full-time or part-time city attorney or by any reasonable contractual arrangement. But the power to make an appointment, they concluded, had to be conveyed to a mayor by charter or ordinance, neither of which existed. They further opined that the power to contract and to terminate contracts rested with the council.

In June 2016, Mayor Benson selected David Linehan of the law firm, Kenyon Disend, PLLC, to serve as city attorney. The city council twice voted down the Kenyon Disend contract the following month, and, on October 6, 2016, passed a motion stating that Kenyon Disend "is not recognized as the city attorney." Mayor Benson refused to recognize these decisions as valid and instead entered into a series of contracts with Kenyon Disend for legal services as city attorney.

In December 2016, the council passed a resolution stating that the "serial contracts by the Mayor for professional services without Council approval are prohibited." Nonetheless, Mayor Benson thereafter entered into another series of legal services agreements with Kenyon Disend, dated January 1, 2017, January 10, 2017, February 14, 2017, and May 1, 2017. Each agreement was capped at $15,000.

On May 18, 2017, the city council passed Resolution No. 17-1171, authorizing the retention of Jane Koler of Land Use & Property Law, PLLC (Koler) and Dan Glenn of Glenn & Associates, P.S. (Glenn) to provide "interim legal services for the City." Mayor Benson informed Koler and Glenn that they would not be paid for any legal services they provided and refused to endorse the resolution. She added a handwritten notation on the resolution indicating it was invalid because the council president and mayor pro tem have "no authority to contract for legal services."

Despite Mayor Benson's rejection of Resolution No. 17-1171, on June 17, 2017, the city council passed a resolution discharging Kenyon Disend. Pat Pepper, the city council president, and Erika Morgan, another councilmember, acting in her capacity as mayor pro tem, then executed contracts with Koler and Glenn to provide legal services to the City. The contracts were identical to the one the council had previously approved for Morris.

On July 6, 2017, the city council authorized litigation to enforce the legal services contracts it had signed. A month later, the council passed Resolution 17-1182, authorizing a contract with attorney Anne Bremner. Bremner's contract

required her to "provide legal services to the City Council" and "shall be principally responsible for performing services related to actions beyond the scope of Mayor Benson's lawful authority and associated actions or failure to act." Once again, Mayor Benson rejected this resolution, noting that the "council has no contracting authority."

In October 2017, Bremner filed a lawsuit in King County Superior Court on behalf of the city council against Mayor Benson seeking to compel her to honor the council's contracts with Koler and Glenn.[1]

The following month, the City held elections for mayor and two council positions. Mayor Benson was reelected and two new councilmembers, generally aligned with Benson, were elected. In January 2018, the new city council voted to repudiate the Koler, Glenn, and Bremner contracts and instructed Bremner to withdraw the case against Benson. The case was voluntarily dismissed with prejudice.

To date, Koler, Glenn, and Bremner have not been paid by the City for any work performed pursuant to their contracts.

In April 2019, Koler, Glenn, and Bremner filed this lawsuit seeking injunctive and declaratory relief as well as monetary damages for the City's breach of their contracts. The trial court granted the City's motion for summary judgment, concluding that Mayor Benson had the power to appoint a city attorney, and the city council had no authority to contract for additional legal services. It dismissed

---

[1] City Council of Black Diamond v. Carol Benson, No. 17 - 2-26654-0-KNT.

the attorneys' lawsuit against the City and awarded attorney fees to the City.  The

attorneys appeal.

## ANALYSIS

Appellate courts review a summary judgment order de novo and perform

the same inquiry as the trial court.  Borton & Sons, Inc. v. Burbank Props., LLC,

196 Wn.2d 199, 205, 471 P.3d 871 (2020).  A moving party is entitled to summary

judgment "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine

issue as to any material fact."  CR 56(c).  This court views all facts and reasonable

inferences in the light most favorable to the nonmoving party.  Owen v. Burlington

N. and Santa Fe R.R. Co., 153 Wn.2d 780, 787, 108 P.3d 1220 (2005).

This dispute concerns the power of a mayor and city councilmembers to

hire and fire city attorneys.  We conclude that the mayor lacked the authority to

"appoint" a city attorney under RCW 35A.12.090 because the city council had not

passed an ordinance making the city attorney an "appointive officer" under RCW

35A.12.020.  As a result, the city council had the authority under RCW 35A.11.010

to terminate Kenyon Disend's contract and to hire Koler and Glenn.  We further

conclude the city council had the implied authority to retain the services of special

counsel to litigate the validity of the mayor's actions.

A. The Black Diamond City Attorney is Not an "Appointive Officer"

The City contends the mayor has exclusive authority to determine who will

act as the city attorney because she has the power of appointment under RCW

35.12.090.  We reject this argument because the mayor only has this power if the

city council has granted it to her by ordinance. No such grant of authority exists here.

The City of Black Diamond is a "noncharter code city" with a "mayor-council plan of government." Black Diamond Municipal Code (BDMC) § 1.08.010. Noncharter code cities are subject to the provisions of the Optional Municipal Code, Title 35A RCW. RCW 35A.01.020. Chapter 35A.12 RCW sets out the powers of city mayors and councils.

RCW 35A.12.190, entitled "powers of council," provides that a city council under a mayor-council plan of government "shall have the powers and authority granted to the legislative bodies of cities governed by this title, as more particularly described in chapter 35A.11 RCW." RCW 35A.11.010 expressly grants to a city's "legislative body" the power to "contract and be contracted with." RCW 35A.11.020 further provides that the "legislative body" has "all powers possible for a city or town to have under the Constitution of this state, and not specifically denied to code cities by law," and may "organize and regulate its internal affairs." The City's "legislative body" is its five-member elected council. RCW 35A.12.010.

RCW 35A.12.020 requires a city to provide for "appointive officers" through charter or ordinance. It separately authorizes a city to provide legal services through one of two ways:

> Provision shall be made for obtaining legal counsel for the city, either by appointment of a city attorney on a full-time or part-time basis, or by any reasonable contractual arrangement for such professional services.

If a city council has chosen to make the city attorney an "appointive officer," then RCW 35A.12.090 gives the mayor the power to hire and fire such officers:

> The mayor shall have the power of appointment and removal of all appointive officers and employees subject to any applicable law, rule, or regulation relating to civil service . . . . Confirmation by the city council of appointments of officers and employees shall be required only when the city charter, or the council by ordinance, provides for confirmation of such appointments. Confirmation of mayoral appointments by the council may be required by the council in any instance where qualifications for the office or position have not been established by ordinance or charter provision.

In other words, if an ordinance or charter provision gives the mayor the power to appoint this officer, then the mayor may do so. If, however, no ordinance or charter provision gives the power of appointment to the mayor, then the city may provide for legal services of a city attorney through "any reasonable contractual arrangement."

This reading of RCW 35A.12.020 and 35A.12.090 is consistent with AGO 1997 No. 7, which opined that "if the city charter or a city ordinance provides for the appointment of a city attorney, then the mayor has authority to choose the city attorney." 1997 Op. of the Att'y Gen. No. 7.[2] If, however, the city council has not made the city attorney an "appointive officer," then it is the council who retains the authority to make a "'reasonable contractual arrangement'" for such professional services. See Id.

The City argues that its city attorney is an "appointive officer" under RCW 35A.12.020. We disagree for three reasons. First, the City, a noncharter city, has not passed an ordinance making the city attorney an appointive officer. Although the city council had, prior to 2019, passed ordinances referring to the duties to be performed by a city attorney, none actually created the position as an appointive

---

[2] Available here: https://www.atg.wa.gov/ago-opinions/cities-and-towns-lawyers-manner-which-optional-municipal-code-city-provides-legal.

officer.[3] In contrast, the city council passed ordinances explicitly creating the office of the city administrator and the office of the police chief, appointed by and subject to the control of the mayor. BDMC §§ 2.10.010, 2.16.010. No similar ordinance exists creating the office of city attorney. The 2019 city council conceded as much when, in passing Ordinance No. 19-1124, it recognized that "the Black Diamond Municipal Code currently lacks any provisions governing the process for selecting and retaining a City Attorney."[4]

Second, the Black Diamond code requires appointive officers to receive a salary and sets a maximum term of one year for such officers; these provisions conflict with the terms of the attorneys' contracts. Under Chapter 2.08, entitled "Appointive Officers and Employees Generally," appointive officers "shall receive such salaries as may be provided from time to time by ordinance." BDMC § 2.08.060. An appointive officer receiving such a salary "shall hold office for a term of one year or until his successor is appointed and qualified." BDMC § 2.08.030. None of the legal services agreements signed by Morris, Kenyon Disend, Koler, Glenn, or Bremner provided for the payment of a salary or set a term consistent

---

[3] The City cites to BDMC §§ 1.12.010(C) (giving "the city attorney" discretion to treat code violations as civil violations); 2.62.019 (setting rates for "city staff time" for processing development proposals, including "city attorney"); 2.66.020 (providing that legal defense of City officials "shall be provided by the office of the city attorney" unless a conflict requires retention of outside counsel, in which case the City will indemnify the official but not in excess of the "hourly rate of the city attorney"); 17.20.010(H) (giving "the city attorney" authority to approve title insurance policies submitted for subdivision plats); and 19.24.080(B) ("Conservation easements shall be on a form approved by the Black Diamond City Attorney"). None of these provisions designated the city attorney as an appointive city officer; they merely describe duties that anyone retained in that position will perform.

[4] In August 2019, the City passed an ordinance stating that "The city attorney shall be selected by the mayor with confirmation by the council, and shall serve at the pleasure and under the primary direction of the mayor." BDMC § 2.14.020. Prior to that date, the BDMC lacked any provisions governing the process of selecting a city attorney.

with BDMC § 2.08.030. All of the agreements were terminable at will on either 30 or 60 days' notice.

Finally, the terms of the legal services agreements that the mayor signed before this dispute arose are more consistent with RCW 35A.12.020's contemplated alternative method of obtaining legal advice through a "reasonable contractual arrangement for such professional services," than with the notion that they served as an appointed city officer. For example, the legal services agreement executed by Morris identified her as an "independent contractor." Her law firm, as well as Linehan's firm, was required to bill the city on an hourly basis, to indemnify and hold the City harmless from their negligence, and to maintain professional liability insurance. The indemnification provisions in the legal services agreements directly conflict with BDMC § 2.66.020 in which the City assumes the duty of indemnifying its employees and appointed officers for claims against them. None of these agreements identified Morris or Linehan as an appointed city officer.

Because the city council did not, by ordinance, provide that the city attorney is an appointive officer, RCW 35A.12.090 did not confer on Mayor Benson the exclusive authority to contract for legal services.

B. The City Council Had the Authority to Terminate Linehan and Hire Koler and Glenn as City Attorney

The attorneys maintain that if RCW 35A.12.090 does not apply, the city council had the primary authority to contract for legal services and to terminate Linehan's firm and retain Koler and Glenn. We agree.

First, a mayor's power to contract on behalf of a city is limited to the authority given to her by the city council. RCW 35A.12.100 provides:

> The mayor shall be the chief executive and administrative officer of the city, in charge of all departments and employees . . . . He or she shall see that all laws and ordinances are faithfully enforced and that law and order is maintained in the city, and shall have general supervision of the administration of city government and all city interests . . . . He or she shall see that all contracts and agreements made with the city or for its use and benefit are faithfully kept and performed.

While this statute gives the mayor the authority to supervise city contracts, it does not confer the authority to enter into contracts on behalf of the city in the absence of a charter provision or ordinance delegating such authority to her. The mayor's authority is limited to ensuring the contracts are performed.

In this case, the Black Diamond City Council has delegated some contracting authority to its mayor through BDMC § 2.90.010(B), which allows the mayor to execute professional services contracts for $15,000 or less, "if there is money to cover cost of services and the services are specifically included as a line item in the city's budget." Mayor Benson clearly relied on this authority when she executed contracts with Kenyon Disend beginning in June 2016, because each contract provided that "[t]otal compensation for services associated with this agreement shall not exceed $15,000." But the mayor's limited contracting authority is derivative of and subordinate to the council's primary authority to enter into contracts granted under RCW 35A.11.010.

Because the city council had primary authority to enter into contracts on behalf of the City, it also has the authority to specify a contract's duration and the right to terminate it. The legal services agreement with Kenyon Disend provided that "[e]ach party shall have the right to terminate this Agreement, with or without cause, upon sixty days' written notice." The "parties" to the agreements were

identified as "the City," (not the mayor) and Kenyon Disend. The city council, acting on behalf of the City, had the statutory power to pass resolutions in June 2017 discharging Kenyon Disend and hiring Koler and Glenn.

Although Mayor Benson purported to invalidate these resolutions, the City does not dispute that she lacks the statutory authority to veto resolutions passed by the city council or contracts the council had the authority to execute.[5] Under RCW 35A.12.100, the mayor possesses the authority to veto "ordinances" passed by the City council; that power does not extend to resolutions.[6] A majority of councilmembers passed resolutions ending the Kenyon Disend agreement and authorizing the execution of agreements with Koler and Glenn. Their decision to terminate Linehan's services and to hire Koler and Glenn and to do so via resolution was not subject to the mayoral veto power.

We thus conclude that the city council's resolution terminating the legal services of Kenyon Disend was valid and after taking this action, nothing prevented the council from contracting with Koler and Glenn to fill the city attorney position.

C. The Councilmembers Had the Legal Authority to Retain Special Counsel to Litigate the Validity of the Mayor's Actions

The City contends that because it had a valid contract with Kenyon Disend for city attorney services, the council could not contract for additional legal services to challenge the mayor's conduct. But because Mayor Benson lacked the authority

---

[5] At summary judgment, the City's attorney conceded that the mayor did not have the authority to veto resolutions or contracts.
[6] RCW 35A.12.100 states: "The mayor shall have the power to veto ordinances passed by the council and submitted to him or her as provided in RCW 35A.12.130 but such veto may be overridden by the vote of a majority of all councilmembers plus one more vote." No provision of the Optional Municipal Code or BDMC provides that the mayor possesses similar authority to veto resolutions.

to reject the City's valid contracts with Koler and Glenn, we conclude that the councilmembers were justified in seeking additional legal services.

"As a general rule, when a municipal corporation has legal counsel charged with a duty of conducting the legal business of a government agency, contracts with other attorneys for additional or extra legal services are void." Volkmer, 73 Wn. App. at 94. But Washington courts have recognized exceptions to this general rule. In Wiley v. City of Seattle, 7 Wash. 576, 35 P. 415 (1894), the city's legislative body passed an ordinance authorizing the issuance of illegal bonds based on the advice of the city attorney. Id. at 577. When the mayor vetoed the ordinance, the legislative body overcame the veto with a unanimous vote based on the city attorney's advice and then obtained a writ of mandamus requiring the mayor to sign the bonds. Id. When the city attorney refused to defend the mayor in the mandamus action, the mayor hired outside counsel and successfully established the illegality of the bonds. Id. The city then refused to pay the legal fees of the mayor's counsel. Id.

The Supreme Court recognized the case demonstrated "an emergency in the affairs of a municipal corporation" and in such emergencies, "where both the legislative and the judicial departments of the city [were] arrayed against its chief executive, to compel him to perform an illegal and unconstitutional act," the mayor had the authority to hire outside counsel to resist these illegal acts. Id. at 578-79. The court reasoned:

> The mayor was then in this position: The constitution, the statute law, and the charter itself forbade him to sign the bonds, or do anything towards putting them in circulation, and, under the solemnity of his official oath, he was bound to obey; but, on the other hand, the

ordinance passed over his veto by unanimous votes, and the alternative writ of mandamus from the court commanded him to proceed. It was a most important case, involving the city's liability for more than $700,000, which no man in official position ought to be required to submit to a court without legal assistance.

Id. at 578. The Supreme Court said "the city's business [] was in jeopardy," and the mayor was bound to employ counsel and bound to pay for the reasonable value of the legal services he obtained. Id. at 579. "That he was so bound we consider to be demonstrated by the success of the defense, which proved the correctness of his position, and saves the city from an immense apparent liability." Id.

In City of Tukwila v. Todd, 17 Wn. App. 401, 563 P.2d 223 (1977), the Tukwila City Council sued the mayor, Frank Todd, to enjoin him from setting employee salaries above the level specified in the city's annual budget. Id. at 402. Because the council believed the city attorney to be biased in favor of Todd, it hired special counsel to file the lawsuit. Id. at 403. The court concluded that Todd's actions were illegal under the statutory framework in effect at the time. Id. at 405. Based on the trial court's finding that the sitting city attorney was biased on behalf of the executive branch, and its conclusion that the mayor lacked authority for his actions, the court concluded the city council was justified in hiring independent legal counsel at public expense. Id. at 406-07.

More recently, in Volkmer, Division Two of this court described the two exceptions recognized in Wiley and Todd in this way:

One, if the council hires outside counsel to represent it, and it prevails on the substantive issue to the benefit of the town, a court may direct the town to pay the reasonable fees and costs of outside counsel. Two, if extraordinary circumstances exist, such that the mayor and/or town council is incapacitated, or the town attorney refuses to act or is incapable of acting or is disqualified from acting, a court may

> determine that a contract with outside counsel is both appropriate and necessary.

73 Wn. App. at 95. In that case, the Steilacoom town council passed a resolution finding that it needed to retain independent legal counsel to render advice regarding the mayor's authority to schedule a public hearing on a variance request for the town's improvements to "First Street." Id. at 91-92. It also passed a resolution hiring outside counsel and authorizing the payment of the attorney's services with public funds. Id. The mayor refused to sign the resolution, concluding it was illegal. Id. at 93. The counsel then initiated a mandamus action to force the mayor to sign the resolution. Id. The council contended that the mayor had a nondiscretionary duty to sign the resolution and that, in light of the mayor's failure to fulfill that duty, the council had the implied authority to retain private counsel in its dispute with the mayor because of its perception that the town's attorney could not provide impartial advice. Id.

The court rejected the council's argument that the mayor was obligated to sign any resolution, holding that "[w]hile we agree that the Mayor has a ministerial duty to sign valid ordinances passed by the Council, that duty does not apply to invalid ordinances." Id. It then concluded that neither Wiley nor Todd applied to Steilamcoom because "[i]n both of these cases, the underlying substantive issue was resolved in favor of the party soliciting outside counsel before the court approved the expenditure of public funds for outside counsel." Id. at 96. In Volkmer, the court said, the council did not seek a judicial resolution of its plenary authority over street improvements or a judicial determination that an emergency existed justifying the retention of outside counsel. Id. at 96-97. Volkmer thus

limited the two exceptions to circumstances in which the underlying legal dispute is resolved in favor of the party retaining special counsel.

The City argues that under Volkmer, it cannot be held liable for Bremner's legal fees because the lawsuit she initiated on behalf of the city council was dismissed with prejudice without a ruling in the council's favor. But we have concluded that the mayor lacked the legal authority to reject the council's resolutions discharging Kenyon Disend and approving the contracts with Koler and Glenn. The lawsuit Bremner was hired to initiate was not dismissed on its merits but was withdrawn at the request of a newly elected city council. Had that matter proceeded to a decision on the merits, the city council would have prevailed.

We conclude that this case is analogous to Todd, in which a court was asked to determine whether the mayor acted illegally and whether the conflict between the executive and legislative branches justified the retention of private legal counsel to adjudicate the validity of the mayor's actions. Todd, 17 Wn. App. at 405-07. Here, the city council hired Bremner to challenge Mayor Benson's power to reject City contracts for legal services. And it seems apparent to us that the city council had a basis for seeking independent counsel because the dispute directly involved Mayor Benson's authority to retain the attorney she selected as city attorney. Linehan clearly supported the mayor's actions, but also recognized in a 2016 email to the city councilmembers that their dispute with the mayor probably justified hiring special counsel to litigate the matter. He wrote:

> [A] reasonable argument exists that the circumstances currently confronting the City of Black Diamond may well fall into the narrow category of situations recognized by Washington courts wherein the City Council may enter into separate contracts for independent legal

counsel on a particular matter. Specifically, where the Council and the Mayor disagree over the legal validity of certain actions or practices, I believe most (but not all) courts would likely recognize a sufficient need for an independent counsel to be retained to advise the Council, and for the City to pay this expense.

Because there were clear disputes between the mayor and city council regarding the legality of the mayor's conduct and the city council would have prevailed in the lawsuit initiated by Bremner had it proceeded to final resolution, we conclude the council had the authority to contract with Bremner under Volkmer.[7] We reverse the trial court's order granting summary judgment for the City and remand for further proceedings consistent with this opinion.[8]

_Andrus, A.C.J._

WE CONCUR:

_Mann, C.J._                 _Verellen, J._

---

[7] We decline to reach the City's alternative arguments that the attorneys' failure to obtain a city business license constitutes a material breach and renders the contracts illegal. The trial court did not decide this issue and, on this record, we cannot conclude as a matter of law that any of the attorneys materially breached their contracts by failing to obtain a city business license.

[8] The trial court awarded attorney fees and costs to the City under the prevailing party fee provision in the attorneys' contracts. Because we reverse the trial court's order granting summary judgment for the City, we also reverse the award of fees and costs.